Nott J.
delivered tbe opinion of tbe court.
This is an action brought to recover $15,000 damages suffered by reason of tbe defendants’ breach of their agreement to purchase of tbe claimant twelve hundred horses in 1864.
The argument of the distinguished counsel for the claimant, by its faithful and laborious analysis of the evidence, and by the array of learnedly chosen and well-cited cases which it presents, leaves little labor for the court in reaching the final determination of the case.
The rule which we think must govern this case is one designed for the protection of parties occupying the place of these defendants. It is that when an executory contract is renounced by the second party before performance, the first may not needlessly increase his damages for the breach. Thus, where work is to be done, or services rendered, or goods sold, and the party, who is to receive the same renounces his agreement before it has been performed, he who is to perform is not at liberty to proceed and make the contract price the measure of his damages. This was expressly held by this court in McKee’s Case, (1 C. Cls. R., p. 336,) with regard to services, where a government surveyor, after notice that the Commissioner of the Land Office had renounced his contract, completed the survey and sued for the contract price. It was held that he could not recover; and this court, quoting from the Supreme Court of New York, in Clark v. Marsiglia, (1 Denio R., p. 317,) said, “ the plaintiff had no right, by obstinately persisting in the work, to make the penalty upon the defendant greater than it would otherwise have been.”
Where the contract is for the sale of goods instead of the performance of services, the reason of the rule is equally apparent. If the plaintiff were permitted, after notice of the renunciation of the contract, to go on and buy the goods, and tender them, and hold the defendants for the contract price, it most assuredly would “make the penalty upon the defendant greater than it would otherwise have been.” The practical effect of such a license would be, that a claimant would buy the goods as a matter of form, and then, after tender, sell them again as an act of indemnification, and thereby needlessly throw upon the defendant the risk and loss and responsibility of the purchase and sale. Apart from such a license, the defendant *265 would be liable simply for tbe claimant’s profits, and they might be nothing; with such a license the defendant would be further liable for the claimant’s losses, and for all the risks and expenses attendant the property after tender. The government, from the nature of things, is a defendant which is often obliged to renounce executory contracts, and therefore is a defendant peculiarly interested in having the principle recognized in McKee's. Case clearly and carefully maintained.
The object of the more familiar law of tender is merely to fix two facts:
1st. That the one party to a contract is ready and willing to perform.
2d. That the other refuses to allow him to do so.
When the latter expressly renounces his contract he fixes this second fact in the strongest possible manner, and it only remains for the former to show that he was (so far as the other would let him be) ready and willing to perform. In this case it appears that claimant expressly applied to the Chief of the Cavalry Bureau to accept Ms horses or allow them to be accepted under the original contract, and that that officer expressly refused. A tender then to the quartermaster would have been notMng more than an attempt to make a subordinate officer disobey his orders.
It is conceded in this case—
1st. That the defendants, by one of their quartermasters at Washington, entered into a formal written contract for the purchase of twelve hundred horses, deliverable at St. Charles, Illinois, within thirty days.
2d. That the defendants by their Chief of the Cavalry Bureau, shortly after the execution of this contract, and before its performance, forbade their assistant quartermasters to receive horses under any contracts unless the contractors should submit them to a certain inspection.
3d. That the defendants by their said Chief of the Cavalry Bureau positively refused to allow the claimant to proceed and deliver the horses he had agreed to furnish, unless he should submit them to this inspection; and they thus refused, before the claimant had purchased the horses, but while ample time remained for him to do so. There are, therefore, two questions of fact to be determined upon which the case depends:
1st. Did the new inspection required by the defendants in *266 effect make a new contract, so that the refusal to receive the horses without it was, in effect, a renunciation of the existing agreement.
2d. If the defendants thus renounced their contract, then, at the time of the renunciation, had the claimant evinced an intent and ability to perform ?
1. As to the former question, it must be determined by comparing the contract with the order for the new inspection. The contract contemplated the branding of only such horses as should be accepted. The order required the further branding of those which might be rejected. The contract provided that the horses “upon being delivered” should be “examined and inspected without unnecessary delay;” the order required that they “should be placed in the inspection ya/rds at least twenty-four hours before inspecting them.” The contract implied that the horses while undergoing inspection should be at the expense of the defendants; the order specifically declares that “ horses will be fed at the expense of the contractors till they have been branded and accepted.”
Upon the effect to be attributed to these changes the court is divided. To the majority they appear material, and unauthorized by the pre-existing contract. The defendants had a perfect right to guard against fraud by vigilant inspection, but they had no right to mutilate or mark property which they did not accept. The contract contemplated horses being rejected, and for such cases provided specifically. The provision was that “ they should be removed from the government stables within one day after the contractor shall have been notified of said rejection.” There is nothing which implies that they should also be permanently disfigured and materially debased in value. It is suggested that none of the horses were necessarily to be rejected, and that no damage would necessarily be done to the claimant. But the claimant was not bound to try that experiment. The first horse which he would have presented for inspection would have been received only on the condition that the defendants might reject him, and if they should reject him that they might also permanently deface him. Delivering his horses for inspection on those conditions would have been at once claimed as an acquiescence in the terms of the order. If this difficulty could be overcome, there would remain the fact that the contract expressly provided “ that the horses upon being deliv *267 ered should he examined and inspected,” while this order as expressly provided that they should not be examined and inspected upon being delivered, but should be “ placed in the inspection yard at least twenty-four hours before inspecting them.” A provision in a contract that property shall be immediately rejected or accepted on delivery certainly seems to us a material provision, and the change that it shall not be immediately rejected or accepted, but may be held by the vendees an indefinite length of time, certain only in its being at least twenty-four hours,” certainly seems to us a material alteration. Finally, if we were to assume that the right to hold an inspection gave to the defendants the right both to change the time of holding it, and to treat in a different manner than that prescribed by the contract the property rejected, there would still remain the objection that they had no right to transfer the expenses of the inspection from themselves to the claimant. Conceding for the moment that they had the right under the guise of inspection to do just wíiat the Chief of the Cavalry Bureau insisted should be done, it by no means follows that they also had the right to make the claimant pay for their new inspection. This change of expense was a change of price; assuredly when the Chief of the Cavalry Bureau tried to force that into a pre-existing contract, he tried to coerce the contractor into a material alteration of his pre-existing agreement. It was therefore not a vigilant inspection which the order required, but a new contract, working increased delay, greater expense, and largely augmented risk.
2. With regard to the question whether the claimant was willing and able to perform, it appears that the contract was executed at the city, of Washington on the 26th February, and that the horses were to be delivered at St. Charles, Illinois, on the 26th March, 1864. Almost immediately after its execution the claimant, a resident of New York, proceeded to Illinois. About the 8th March the Chief of the Cavalry Bureau arrived at Chicago, and the new inspection was ordered to be enforced. There were then a large supply of horses in the market which could be bought readily for cash. The claimant in person promptly' appealed to the Chief of the Cavalry Bureau to be allowed to fill his contract free from the modifications of the new inspection, and the latter peremptorily refused to allow it to be done. No question is made as to the claimant’s financial *268 ability to procure horses, and it appears that lie bad held other contracts from the government. Therefore, taking into account all these circumstances, there can be little doubt but that the claimant was ready and willing to perform the contract which he had made, and that if the defendants’ officers had allowed him he would have done so.
Upon these facts, we think there is no doubt of the defendants’ liability. The case cited by the claimant’s counsel from 61. & Eq. R., p. 230, is exactly to the point, as is the rule of damages given to the jury. The case of Spicer, (1 C. Cls. R., p. 316,) is cited by the defendants’ counsel, and on looking into it we find that it is certainly identical with this. We are convinced that our decision there was erroneous; not in the general principles of law stated, but in the particular application to the facts admitted by the pleadings. Unfortunately, that case came before us on demurrer, and the attention of the court was diverted (without fault of counsel) to certain averments in the petition respecting the usage of inspections, and to a claim for damages growing out of the wrongful arrest of the claimant. The opinion of the court says of the claimant, “ he never attempted to perform,” and in this the court, as a matter of fact, erred.
In reaching this conclusion, we have thrown aside all the evidence offered by the claimant to show a usage in the manner of government horse inspections, and in the mode by which horse contractors procure their stock, and we rest our decision exclusively on the fact that the express terms of the order change the express terms of the contract.
Taking for the measure of damages the rule approved by Lord Campbell in Curl v. The Ambergate Railway Company, (6 L. & Eq. R., p. 230,) viz., such as would put the claimant as nearly as possible in the same situation as he would have been in if he had been allowed to deliver the horses, we find his damages to be seven dollars a horse on the six hundred horses for which $127 a horse was to have been paid, and eight dollars a horse on the remaining six hundred horses for which $128 a horse was to have been paid, making an aggregate of $9,000.
The judgment of the court is that the claimant recover of the defendants the sum of $9,000.